FILED

November 18, 2016

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 7:15 AM



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**IN THE COURT OF WORKERS' COMPENSATION CLAIMS**
**AT NASHVILLE**

| | | |
|---|---|---|
| **THOMAS PETTY,** | ) | **Docket No. 2016-06-0841** |
| **Employee,** | ) | |
| **v.** | ) | **State File No. 20550-2015** |
| **CONVENTION PRODUCTION** | ) | |
| **RIGGING,** | ) | **Judge Joshua Davis Baker** |
| **Employer,** | ) | |
| **and** | ) | |
| **AUTO OWNERS INSURANCE,** | ) | |
| **Carrier.** | ) | |
| | ) | |

---

## EXPEDITED HEARING ORDER DENYING MEDICAL BENEFITS

---

This matter came before the Court on November 2, 2016, on the Request for Expedited Hearing (REH) filed by Thomas Petty pursuant to Tennessee Code Annotated section 50-6-239 (2015). At issue is Mr. Petty's entitlement to a second opinion concerning his right-shoulder injury and to a panel of physicians for treatment of a foot injury. Alternatively, Mr. Petty asked that the Court order further treatment for his shoulder injury. Convention Production Rigging declined to provide both the second opinion and the panel of physicians due to several doctors' statements indicating Mr. Petty was malingering and/or intentionally magnifying his symptoms. Based on the proof presented at this time, the Court holds Mr. Petty is not entitled to a second opinion on the necessity of surgery for his right-shoulder condition, or to a panel of physicians for treatment of his foot.[1]

### History of Claim

Mr. Petty worked as an audiovisual technician for Convention Production. His duties included installing and removing audiovisual equipment from convention hall stages. According to his testimony, Mr. Petty was helping strike a convention stage at the Opryland Hotel on March 7, 2015, when the stanchion holding the stage curtain broke

---

[1] A complete listing of the technical record and exhibits admitted at the Expedited Hearing is attached to this Order as an appendix.

and the drape and pipe fell approximately twenty feet, striking Mr. Petty in the head, shoulder and elbow. Mr. Petty stated he hurt his right foot and left knee while trying to avoid the drape and pipe. The parties do not dispute that the accident occurred or that Mr. Petty suffered injuries from the accident. The extent of his injuries and need for additional treatment are the disputed issues.

Mr. Petty went to Concentra the day of the accident. According to the medical records, Mr. Petty stated only that the "pipe and drape fell and hit my head." (Ex. 1 at 1.) Concentra providers diagnosed a face/scalp contusion and mastoid air space contusion. When he returned to Concentra a few days later, the provider updated the diagnosis to include a concussion.

The medical note from Concentra mentioned neither a foot nor a knee injury. When asked about this at trial, Mr. Petty stated he told the provider at Concentra about his foot and knee injury, but the provider stated they would "take care of that later." The First Report of Injury also does not include a foot or knee injury, stating only that the falling drape and pipe hit Mr. Petty on the head, back and side. (Ex. 4.)

After his last visit with Concentra, Mr. Petty received no additional treatment for several months. Then, on August 7, Mr. Petty selected Dr. Jason Hubbard, a neurosurgeon at the Howell-Allen Clinic, from a panel of physicians provided by Convention Production. (Ex. 5.)

At the first visit, Dr. Hubbard noted that Mr. Petty complained of headaches, neck and right-shoulder pain, as well as "numbness and tingling down into his arms" when he turned his head in a certain direction. The notes do not mention a foot or knee injury. Dr. Hubbard believed Mr. Petty's complaints stemmed chiefly from his right shoulder. He ordered a cervical-spine MRI to rule out a compression issue. The MRI revealed mild, broad-based, disc bulges at C4-5, C5-6, and C6-7, with positional cord impingement at each level. (Ex. 1 at 18.) Dr. Hubbard recommended physical therapy and epidural blocks, but no surgery to treat these conditions.

Dr. Hubbard also ordered an MRI of Mr. Petty's brain. The results were normal. *Id*. at 27. Dr. Hubbard, however, noted that Mr. Petty complained of headaches that developed "very quickly" after receiving epidural blocks in his cervical spine. Dr. Hubbard could not explain the cause of the headaches, so he referred Mr. Petty for a neurological consultation.

Convention Production provided Mr. Petty a panel of neurologists from which he chose Dr. Steven Graham. (Ex. 5.) Dr. Graham saw Mr. Petty five times over a period of a little greater than three months. At the initial visit, Mr. Petty complained of various problems, including dizziness, light-sensitivity, stuttering and slurred speech. His most prominent complaint, however, concerned headaches. Dr. Graham tried several different

medications to curb Mr. Petty's headache complaints, which pervaded throughout his treatment. He could not explain the cause of the headaches, and the medications seemed to have little curative effect. He recommended Mr. Petty undergo neuropsychological testing.

Dr. James Walker, a neuropsychologist, administered Mr. Petty's neuropsychological test. At the test, Mr. Petty continued to complain of headaches and specifically complained that low-frequency noises put him into a "daze." (Ex. 1 at 49.) Mr. Petty discussed using an "ultrasonic dog training device" and stated that, after turning it on, the sound "put me into a fog for five days." *Id*. at 50. He brought the device to the test and, unbeknownst to Mr. Petty, several persons in the office turned the device on while in the room. Mr. Petty did not react. Later during the testing, however, when Dr. Walker activated the device in front of Mr. Petty, the report indicated he complained "vociferously of tremendous distress." *Id*. at 53.

At the hearing, Mr. Petty denied he reacted strongly when Dr. Walker turned on the dog-training device. He also complained that the testing was long and difficult, and that he was tired after he completed it. He described the testing process as "cruel."

Dr. Walker concluded Mr. Petty had no neuropsychological problems. He found that Mr. Petty did not suffer a serious head injury on March 8, 2015, and further found that Mr. Petty gave poor effort during testing; he stated, "It is my impression that Mr. Petty is consciously feigning the presence of difficulties." *Id*. at 55. He opined Mr. Petty had no serious cognitive or psychiatric impairment and stated he could perform any job for which he was qualified.

After the neuropsychological exam, Mr. Petty returned to Dr. Graham's office for follow-up. At the conclusion of the appointment, Dr. Graham determined Mr. Petty had no neuropsychological problems, assigned Mr. Petty a zero-percent impairment rating, and released him from care. In his medical notes, Dr. Graham wrote that Mr. Petty's "clinical presentation is consistent with malingering." *Id*. at 65-66.

During the period of time Mr. Petty was undergoing neurological treatment and testing, he was also seeing an orthopedic specialist. Upon referral from Dr. Hubbard, Convention Production gave Mr. Petty a panel of orthopedic specialists; he selected Dr. David Moore. (Ex. 5.)

At the initial visit with Dr. Moore, Mr. Petty complained of pain in the anterior and posterior areas of his right shoulder that intensified with overhead work, heavy lifting and examination of the shoulder. Dr. Moore believed Mr. Petty was struggling with "traumatic impingement syndrome" and recommended an MRI to "further evaluate the integrity of his rotator cuff." (Ex. 1 at 25.) He recommended that Mr. Petty perform light-duty work pending the results of the MRI. Unfortunately, Mr. Petty did not undergo

the MRI until April 2016, approximately thirteen months after the accident occurred. The MRI showed labral tears on both the inferior and posterior portions of the shoulder as well as a "large paralabral cyst." *Id*. at 68.

After the MRI, Mr. Petty returned to Dr. Moore's office. Upon review of the MRI, Dr. Moore wrote the following in his note concerning the labrum tear: "My impression is that his degenerative labral tear is an incidental finding. Based on his mechanism of injury, it should not be possible to sustain a labral tear with something striking the superolateral aspect of his shoulder." *Id*. at 73. Dr. Moore's notes also included the following statement: "He did have a neuropsychology evaluation which was consistent with malingering." *Id*. at 71.

Dr. Moore released Mr. Petty to return to work with restrictions of lifting no more than ten pounds, no use of his right upper extremity above chest level, and no use of his right arm while extended from his body. He also informed Mr. Petty that "there is no structural abnormality about his shoulder and that his best way to obtain normal function is to begin using it normally." Dr. Moore planned to recheck Mr. Petty in six-weeks and release him to return to work at full duty.

In an affidavit completed several months after his last office visit, Dr. Moore discussed the MRI results, specifically whether the workplace accident caused the labrum tears. He stated:

> I reviewed the actual scan of the April 19, 2016 MRI, rather than just the report and am aware that the MRI reveals posterior and inferior labral tears. The labral tears are an incidental finding. The labral tears are consistent with age related degeneration of the labrum consistent with an individual of Mr. Petty's age.

(Ex. 3 at ¶5). He further opined the accident did not contribute more than fifty percent in causing the labral tears or aggravate a preexisting condition. *Id*. at ¶¶6-7. Dr. Moore released Mr. Petty from his care and declined to see him back because he had no further treatment to offer Mr. Petty and because Mr. Petty had been "abusive" toward Dr. Moore's office staff. *Id*. at ¶¶13, 15. Dr. Moore recommended that Mr. Petty continue with his home exercise program to increase mobility in his shoulder.

In addition to care from Drs. Hubbard, Graham and Moore, Mr. Petty also received care from Dr. Jeffery Hazlewood. Dr. Hazlewood saw Mr. Petty on two occasions. In his treatment notes, Dr. Hazlewood noted that the other physicians treating Mr. Petty were concerned about symptom magnification and malingering. (Ex. 1 at 79.) He agreed that Mr. Petty's subjective symptoms outweighed his objective findings. In the end, Dr. Hazlewood released Mr. Petty from pain management and opined he retained no permanent impairment.

4

In addition to the treating physicians, Dr. Stephen Neely, an orthopedic surgeon, examined Mr. Petty and provided medical opinions on the cause of his injuries and his need for additional treatment. Concerning the cause of the superior and inferior labrum tears, the following exchange occurred during Dr. Neely's deposition:

Q: Doctor, were the findings on the shoulder MRI consistent with the mechanism of injury that he described to you?

A: You know, with something striking down on to the shoulder, if it hit him in such a fashion that it pushed the humeral portion of the glenohumeral joint inferiorly, which is the description we're given, this could have certainly produced this tearing of the labrum.

(Ex. 6 at 13.) To treat the shoulder injury, Dr. Neely testified he would have offered Mr. Petty surgery. He also recommended Mr. Petty get a second opinion concerning his shoulder.

Counsel for Mr. Petty asked Dr. Neely whether he agreed with Dr. Moore's opinion characterizing the labral tears as "degenerative" and an "incidental finding." Dr. Neely disagreed. When questioned further about Dr. Moore's opinion that incurring a labrum tear from an object striking the superolateral aspect of the shoulder was not possible, Dr. Neely said, "I think it's certainly consistent that it pushed the humeral head inferiorly and pinched the labrum." *Id.* at 35-36.

Regarding the need for additional treatment of Mr. Petty's neck, Dr. Neely testified:

Q: All right. Doctor, given the history – I'm just focusing on the neck at this point. Given the history and the mechanism of injury, if he were your patient, would you provide additional treatment regarding the neck?

A: I'm honestly not sure what additional treatment would be apropos for the neck being that Dr. Hubbard is a neurosurgeon and felt that there was no surgical lesion and this gentleman had failed the injections.

Q: Okay. One last question about the neck. It says, "Tom has neck pain. It is nonspecific. I do not have any anatomical explanation for his pain." Doctor, would positional cord impingement at C4-5, C5-6, and C6-7 provide an anatomical explanation for his pain potentially?

A: It could.

5

Q: Okay.

A: But Dr. Hubbard is the expert.

*Id*. at 32. Although he deferred opinion about treatment for the neck to Dr. Hubbard, Dr. Neely opined that the workplace accident caused Mr. Petty's neck injury. *Id*. at 38-39.

With respect to Mr. Petty's foot, Dr. Neely also opined the workplace accident caused the injury. *Id*. at 39. He, however, believed Mr. Petty had achieved maximum medical improvement from his foot injury. *Id*. at 44.

On cross-examination, counsel for Convention Production asked Dr. Neely if he considered "any other causes other than the incident at work" when forming his causation opinions. Dr. Neely responded: "No, sir, that was the only cause I was given." *Id*. at 50.

After all the doctors released him from their care, Mr. Petty filed a Petition for Benefit Determination (PBD) seeking medical benefits. (T.R. 1.) When the parties failed to resolve their dispute through mediation, the mediator issued a Dispute Certification Notice (DCN). (T.R. 2.) Thereafter, Mr. Petty filed a Request for Expedited Hearing (REH), and this Court convened an evidentiary hearing to consider the dispute. (T.R. 3.)

At the hearing, Mr. Petty argued that Dr. Moore's causation opinion is flawed because Dr. Moore failed to address all the anatomic conditions within the left-shoulder. He asserted that the lay testimony and Dr. Neely's causation opinion were sufficient to prove his entitlement to additional treatment for his shoulder.[2] Additionally, Mr. Petty argued that Convention Production should be required to provide him a panel of physicians to treat his foot because he never received any treatment for that injury. Convention Production argued Mr. Petty needs no further treatment and contended he is malingering. It pointed out that the medical records contain no information concerning a foot or knee injury until many months after his initial treatment, and every physician who treated him indicated a belief that Mr. Petty was malingering or intentionally magnifying his symptoms.

**Findings of Fact and Conclusions of Law**

In deciding Mr. Petty's request for additional medical benefits, the Court must apply the following legal principles. Mr. Petty bears the burden of proof on all prima facie elements of his workers' compensation claim. Tenn. Code Ann. § 50-6-239(c)(6) (2015); *see also Buchanan v. Carlex Glass Co.*, No. 2015-01-0012, 2015 TN Wrk. Comp.

---

[2] In the DCN, Mr. Petty requested additional treatment for the left-shoulder and foot only. He did not request additional treatment for his neck. So far as Mr. Petty sought additional treatment for his neck in this proceeding, the Court holds that Mr. Petty failed to carry his burden of proving the reasonable medical necessity of additional treatment.

App. Bd. LEXIS 39, at *5 (Tenn. Workers' Comp. App. Bd. Sept. 29, 2015). He need not prove every element of his claim by a preponderance of the evidence in order to obtain relief at an expedited hearing. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7- 9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). Instead, Mr. Petty has the burden to come forward with sufficient evidence from which this Court can determine he is likely to prevail at a hearing on the merits. *Id*.

Mr. Petty seeks two forms of relief through this expedited hearing: a second opinion concerning the labrum tears in his shoulder and a panel of physicians to treat his right-foot injury. Alternatively, Mr. Petty seeks a return visit to Dr. Moore. The Court finds Mr. Petty is entitled to no relief at this time.

I.   **Mr. Petty failed to show the workplace accident caused the left-shoulder labrum tears.**

Mr. Petty asked that this Court order Convention Production to provide him a second opinion concerning his need for shoulder surgery. Tennessee Code Annotated section 50-6-204(a)(3)(C) (2015) provides an option for an employee to receive a second opinion on the issue of surgery in certain circumstances. Essentially, the statute allows for a second opinion on the issue of surgical necessity to repair an injury caused by a workplace accident.

In this case, however, the disputed issue concerns not whether the surgery will effectively repair Mr. Petty's shoulder, but whether the workplace accident caused the left-shoulder labrum tears. Because the Workers' Compensation Law only requires an employer to provide reasonable and necessary treatment for injuries caused by the workplace accident (*see* Tennessee Code Annotated section 50-6-204(a)(1)(A) (2015)), Mr. Petty must first show that the accident caused the labrum tears for section 50-6-204(a)(3)(C) to be applicable. Mr. Petty has the burden of proof on this issue and, based on the current proof, the Court holds he failed to carry his burden.

Mr. Petty selected Dr. Moore from a panel provided by Convention Production making Dr. Moore an authorized treating physician under Tennessee Code Annotated section 50-6-204(a)(3)(A)(i) (2015). The Workers' Compensation Law provides that the causation opinion provided by an authorized treating physician shall be presumed correct, but it can be rebutted through presentation of contrary evidence that satisfies a preponderance standard. *See id*. at § 50-6-102(14)(E).

Dr. Moore determined that Mr. Petty suffered only a shoulder contusion in the workplace accident and opined that the labrum tears were "incidental" and "consistent with age related degeneration of the labrum consistent with an individual of Mr. Petty's age." Accordingly, Dr. Moore determined the workplace accident did not cause the

labrum tears. As an authorized treating physician, his opinion is presumed correct. To receive any medical benefits for the labrum tears, Mr. Petty must rebut this presumption.

In an effort to rebut the presumption, Mr. Petty secured deposition testimony from Dr. Neely. Dr. Neely stated he provided his opinions within a reasonable degree of medical certainty. However, when asked specifically whether the workplace injury caused the labrum tears, he opined, "You know, with something striking down on to the shoulder, if it hit him in such a fashion that it pushed the humeral portion of the glenohumeral joint inferiorly, which is the description we're given, this *could have certainly produced this tearing of the labrum*." (Ex. 6 at 13) (Emphasis added.) Dr. Neely also admitted he considered no causes other than the workplace accident when determining causation of the labrum tears. *Id*. at 50.

The Workers' Compensation Law defines the phrase "shown to a reasonable degree of medical certainty" to mean that, "in the opinion of the physician, it is more likely than not considering all causes, as opposed to speculation or possibility." Tenn. Code Ann. § 50-6-102(14)(D) (2015). The Court finds Dr. Neely's opinion failed to satisfy this standard for two reasons: (1) the opinion is speculative in that provides the accident "could have" produced the labrum tears; and, (2) Dr. Neely admitted he considered only the accident as the possible cause and, therefore, did not consider "all causes." *See id*.

Dr. Moore opined Mr. Petty suffered only a shoulder contusion in the workplace accident and determined the labrum tears were degenerative and "incidental." His opinion is presumed correct, and Mr. Petty failed to rebut that presumption. Accordingly, Mr. Petty failed to carry his burden of proving he would likely succeed at a hearing on the merits in proving the compensability of his left-shoulder labrum tears.

The Workers' Compensation Law requires an employer to provide reasonable and necessary care for an injury caused by a workplace accident. At this time, Mr. Petty cannot show the workplace accident caused his left-shoulder labrum tears; therefore, he is entitled to no treatment for the tears. Because he is not entitled to treatment for the labrum tears, he is also not entitled to a second opinion on the need for surgery to correct the labrum tears. Accordingly, this Court must deny his request for a second opinion concerning the need for surgery to repair his left-shoulder labrum tears.[3]

---

[3] The parties presented significant testimony concerning Mr. Petty's pre- and post-injury physical abilities. While the Court appreciates that Mr. Petty's testimony concerning his physical condition is relevant to determining causation, his testimony cannot provide sufficient weight to carry his burden of proof in light of Dr. Neely's speculative causation opinion and Dr. Moore's opinion that the labrum tears are not work-related.

## II.    Mr. Petty failed to prove entitlement to treatment for his foot injury or a return visit to Dr. Moore for his shoulder injury.

Mr. Petty seeks additional treatment from Dr. Moore for his shoulder injury and a panel of physicians for his foot injury. Because Mr. Petty failed to show that additional care for either condition is reasonable and necessary, the Court denies his request for relief at this time.

Tennessee law requires an employer to provide "free of charge to the employee such medical and surgical treatment . . . made reasonably necessary by accident as defined in this chapter[.]" *See* Tenn. Code Ann. § 50-6-204(a)(l)(A) (2015). In providing the treatment, the Workers' Compensation Law requires an employer to, "designate a group of three (3) or more independent reputable physicians, surgeons, chiropractors or specialty practice groups if available in the injured employee's community or, if not so available, in accordance with subdivision (a)(3)(B), from which the injured employee shall select one (1) to be the treating physician." *Id.* at § 50-6-204(a)(3)(A)(i). Groups of physicians provided under section 50-6-204(a)(3)(A)(i), commonly called "panels," must be offered to the injured employee in a timely fashion. In fact, the Bureau of Workers' Compensation rules require the employer to "immediately" provide the injured employee a panel upon notice of any workplace injury, "other than a minor injury for which no person could reasonably believe requires treatment from a physician." Tenn. Comp. R. & Regs. 0800-02-01-.25(1) (2015).

Here, neither the medical records nor the First Report of Injury indicates that Mr. Petty injured his foot in the workplace accident. In fact, the medical records contain no information concerning a foot injury until Mr. Petty had been treating with various physicians over several months. Furthermore, while Mr. Petty maintains he reported the foot injury to providers at Concentra and still suffers pain from the injury, his own evaluating physician, Dr. Neely, opined that he has attained maximum medical improvement from the foot condition. Accordingly, the Court holds Mr. Petty is unlikely to prevail at a hearing on the merits in proving that treatment for his foot is reasonable and necessary. The Court, therefore, denies his request for a panel of physicians to provide treatment for his alleged foot injury.

The same principle applies to Mr. Petty's request for additional shoulder treatment. Dr. Moore diagnosed Mr. Petty with a shoulder contusion and said he needs no further treatment but should continue his home exercise plan. Dr. Moore also released Mr. Petty from his care. The Court is mindful that Mr. Petty's request for additional care chiefly concerns his left-shoulder labrum tears. Mr. Petty, however, failed to prove the labrum tears are causally related to his workplace accident. Therefore, any treatment necessary for the labrum tears is not medically necessary and reasonable under Tennessee Code Annotated section 50-6-204(a)(l)(A). In light of Dr. Moore's opinion, the Court holds that Mr. Petty is unlikely prevail at a hearing on the merits in proving the

reasonable medical necessity of additional treatment for his shoulder contusion and denies his request for additional medical treatment from Dr. Moore.

**IT IS, THEREFORE, ORDERED** as follows:

1.  Mr. Petty's claim for medical benefits is denied at this time.

2.  This matter is set for an Initial (Scheduling) Hearing on January 9, 2017, at 11:00 a.m. (CDT).

**ENTERED THIS THE 18TH DAY OF NOVEMBER, 2016.**

_____

**Judge Joshua Davis Baker**
**Court of Workers' Compensation Claims**

Initial Hearing:

An Initial (Scheduling) Hearing has been sent for **January 9, 2017, at 11:00 a.m. (CST) with Judge Joshua Davis Baker, Court of Workers' Compensation Claims. You must call 615-741-2113 or toll free at 855-874-0474 to participate in the Initial Hearing.**

**Please Note:   You must call in on the scheduled date/time to  participate. Failure to call in may result in a determination of the issues without your further participation. All conferences are set using Central Time (CT).**

<u>Right to Appeal:</u>

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk within seven business days of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a filing fee in the amount of $75.000. Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **<u>Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.</u>**

5. The parties, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a joint statement of the evidence within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the clerk of the Appeals Board.

6. If the appellant elects to file a position statement in support of the interlocutory appeal, the appellant shall file such position statement with the Court Clerk within five business days of the expiration of the time to file a transcript or statement of the evidence, specifying the issues presented for review and including any argument in support thereof. A party opposing the appeal shall file a response, if any, with the Court Clerk within five business days of the filing of the appellant's

position statement.    All position statements pertaining to an appeal of an interlocutory order should include:  (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

**APPENDIX**

Exhibits:

1. Medical Records
2. Mr. Petty's Affidavit
3. Dr. Moore's Affidavit
4. First Report of Injury
5. Medical Panels
6. Dr. Neely's Deposition Transcript
7. Hospital Discharge Record
8. MRI Requisition Report
9. Email Correspondence Between Mr. Petty and the Nurse Case Manager

Technical record:[4]

1. Petition for Benefit Determination filed July 25, 2016
2. Dispute Certification Notice filed September 23, 2016
3. Request for Expedited Hearing filed August 11, 2016
4. Request for Expedited Hearing filed August 15, 2016
5. Mr. Petty's Witness and Exhibit List
6. Convention Production's Witness and Exhibit List
7. Objection to Introduction of Dr. Moore's Affidavit
8. Convention Production's Prehearing Statement

---

[4] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Expedited Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent to the following recipients by the following methods of service on this the18th day of November, 2016.

| Name | Certified Mail | Via Fax | Via Email | Email Address |
|------|----------------|---------|-----------|---------------|
| Drew Saulters | | | X | dsaulters@ortalekelley.com |
| Michael Haynie | | | X | mhaynie@manierherod.com |

_____
Penny Shrum, Court Clerk
Wc.courtclerk@tn.gov